STUART, Justice.
SSC Montgomery Cedar Crest Operating Company, LLC (“SSC Montgomery”), *1195 appeals the judgment of the Montgomery Circuit Court denying its motion to compel arbitration of the medical-malpractice claim asserted against it by Linda Bolding, as attorney in fact and next friend of her father, Norton Means. We affirm.
I.
On January 8, 2012, Means was hospitalized after experiencing stroke and/or heart-attack symptoms. On approximately January 25, 2012, he was admitted to Cedar Crest, a nursing-home facility operated by SSC Montgomery, to receive rehabilitation and nursing services while he recovered. At the time Means was admitted to Cedar Crest, he was accompanied by his daughter, Michelle Pleasant, who completed the necessary paperwork on his behalf. Among the paperwork completed and signed by Pleasant was a dispute-resolution agreement (“the DRA”) providing that the “parties” waived their right to a judge or jury trial in the event a dispute arose between them and instead agreed to resolve any such dispute by way of a dispute-resolution program consisting of mediation and binding arbitration. The DRA further defined the term “parties” as including:
“(a) [T]he resident, any and all family members who would have the right to bring a claim in state court on behalf of the resident or the resident’s estate, a legal representative, including a power of attorney for healthcare and/or financial matters or a court appointed guardian, or any other person whose claim is derived through or on behalf of the resident, including, in addition to those already listed in this definition, any parent, spouse, child, executor, administrator, heir or survivor entitled to bring a wrongful death claim, and (b) the facility, [related corporate entities, and any of their employees or agents].”
Pleasant signed her name on the final page of the DRA on a line indicated for the “Signature of Legal Representative or Family Member” and under the following paragraph:
“If resident is adjudged incompetent, complete this section:
“I am the spouse, responsible party, legal guardian or power of attorney of the resident and have the authority to sign the agreement on his/her behalf. In signing this Agreement, the Legal Representative or Family Member binds both the Resident and themselves individually.”
On' March 2, 2012, Means was hospitalized again. On March 6, 2012, another of his daughters, Linda Bolding, whom Means had previously granted a durable power of attorney, sued SSC Montgomery, alleging that Cedar Crest staff had negligently cared for Means, causing him to suffer dehydration, malnourishment, and an untreated infection that combined to result in his hospitalization on March 2.[1] On April 5, 2012, SSC Montgomery filed both its answer denying Bolding’s allegations and a motion to compel arbitration pursuant to the terms of the DRA. Bolding subsequently filed a response, arguing that it would be improper to enforce the DRA because, she argued, Pleasant had no legal authority to act on Means’s behalf at the time Pleasant executed the DRA. Following a September 12, 2012, hearing, the trial court entered an order denying SSC *1196 Montgomery’s motion to compel arbitration. On October 2, 2012, SSC Montgomery filed its timely notice of appeal to this Court.
II.
Our standard of review of a ruling denying a motion to compel arbitration is well settled:
“ ‘This Court reviews de novo the denial of a motion to compel arbitration. Parkway Dodge, Inc. v. Yarbrough, 779 So.2d 1205 (Ala.2000). A motion to compel arbitration is analogous to a motion for a summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction affecting interstate commerce. Id. “[Ajfter a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.” Jim Burke Automotive, Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala.1995) (opinion on application for rehearing).”’
Elizabeth Homes, L.L.C. v. Gantt, 882 So.2d 313, 315 (Ala.2003) (quoting Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala.2000)).
III.
There is no dispute that a contract calling for arbitration — the DRA- — ■ exists in this case and that that contract evidences a transaction affecting interstate commerce. The issue here is whether the DRA applies to the claims brought by Bolding on behalf of Means, neither of whom signed the DRA. The general rule in Alabama is that “a nonsignatory to an arbitration agreement cannot be forced to arbitrate her claims.” Cook’s Pest Control, Inc. v. Boykin, 807 So.2d 524, 526 (Ala.2001). However, there are exceptions to this rule, see generally MTA, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 114 So.3d 27, 31 (Ala.2012), and this Court has created a distinct body of case-law considering specifically the issue how and when arbitration agreements executed by the owners and operators of nursing homes and their residents and/or their residents’ family members should be enforced. See Owens v. Coosa Valley Health Care, Inc., 890 So.2d 983 (Ala.2004); Briarcliff Nursing Home, Inc. v. Turcotte, 894 So.2d 661 (Ala.2004); Noland Health Servs. v. Wright, 971 So.2d 681 (Ala.2007); Carraway v. Beverly Enters. Alabama, Inc., 978 So.2d 27 (Ala.2007); and Tennessee Health Mgmt., Inc. v. Johnson, 49 So.3d 175 (Ala.2010). The United States Court of Appeals for the Eleventh Circuit recently reviewed this caselaw in Entrekin v. Internal Medicine Assocs. of Dothan, P.A., 689 F.3d 1248, 1259 (11th Cir.2012), and concluded, correctly, that the principle to be extracted from these cases is that an arbitration agreement that binds the nursing-home resident also binds the resident’s representative. Thus, in order to determine whether Bolding is bound by the DRA, we must determine whether Means was bound by the DRA. For the reasons that follow, we conclude he was not.
The only evidence before the Court in this case indicates that Means was mentally incompetent when he was admitted to Cedar Crest and the DRA was executed; indeed, SSC Montgomery does not even argue that he was competent at any relevant time. The evidence of Means’s incompetency includes an affidavit submitted by Bolding in which she states: “On January 25, 2012, my father was mentally incompetent and physically incapacitated. *1197 My father did not have the mental capacity to give his consent to an arbitration agreement at that time.”[2] Moreover, Pleasant signed the DRA, provided her by SSC Montgomery, underneath a paragraph that instructed: “If resident is adjudged incompetent, complete this section.”
Children and the mentally incompetent have traditionally been treated differently under the law than the standard competent adult. See, e.g., Ex parte E.R.G., 73 So.3d 634, 678 (Ala.2011) (Main, J., dissenting) (“The state necessarily injects itself into the affairs of children and the mentally incompetent when they are in need of protection because their developmental differences and their environmental restraints render them more vulnerable than competent adults.”). And, while we have held that competent residents of nursing homes may be bound by arbitration agreements executed by their representatives, see, e.g., Carraway, 978 So.2d at 30-31, and Johnson, 49 So.3d at 176, orn-eases also indicate that incompetent residents are not so bound. In Noland Health Services, we considered whether the administrator of Dorothy Willis’s estate was bound to arbitrate personal-injury and wrongful-death claims stemming from Dorothy’s treatment at a nursing home pursuant to an arbitration provision in a contract executed by Dorothy’s daughter-in-law, Vicky Willis, when Dorothy was admitted to the nursing home. 971 So.2d at 683. A plurality of the Court agreed with the trial court’s finding that Dorothy was incompetent when the contract was signed and that Vicky’s signature as the “responsible party” or next friend on that contract “was ineffective to bind Dorothy or her personal representative to the agreement.” 971 So.2d at 686. In support of that conclusion, the plurality opinion quoted Page v. Louisville & Nashville R.R., 129 Ala. 232, 238, 29 So. 676, 678 (1901), for the proposition that “one who purports to act merely as a ‘next friend’ of a ‘non compos mentis’ is ‘wholly without authority to make any contract that would bind her or her estate.’ ” Noland Health Servs., 971 So.2d at 686.
Of course, Noland Health Services was a plurality opinion, and its precedential value is accordingly limited.[3] Ex parte Achenbach, 783 So.2d 4, 7 (Ala.2000). However, this Court subsequently recognized the principle for which Noland Health Senices is now cited in Johnson. In Johnson, Tennessee Health Management (“THM”) appealed the denial of its motion to enforce an arbitration agreement against Carol Rousseau Johnson, who was prosecuting personal-injury and wrongful-deaths claims against THM in her capacity as the personal representative of the estate of Dolores Rousseau, who allegedly was injured while a resident of a nursing home operated by THM. 49 So.3d at 176. When Dolores was admitted to that nursing home, her daughter Barbara Rousseau had signed an arbitration agreement with THM, but “[tjhere is no evi *1198 dence indicating that Dolores ... was mentally incompetent when she was admitted. 49 So.3d at 176-77. Citing No-land Health Services, Carol subsequently argued to this Court that Dolores was not bound by the arbitration agreement because she had not signed it. 49 So.3d at 180. This Court rejected her argument, distinguishing Noland Health Services as follows:
“Carol relies upon Noland Health Services, Inc. v. Wright, 971 So.2d 681 (Ala.2007). In Noland, a plurality of this Court held that a daughter-in-law’s signature as the responsible party on a nursing-home arbitration agreement was ineffective to bind the resident to the agreement. Noland is distinguishable from this case, however, because the nursing-home resident in Noland was mentally incompetent and could not authorize anyone to act on her behalf and because the daughter-in-law did not sign any document in the capacity of her mother-in-law’s legal representative.”
Johnson, 49 So.3d at 180-81. We thereafter held that the arbitration agreement executed by Barbara did bind Dolores and was therefore enforceable against Carol, thus recognizing the distinction between arbitration agreements signed on behalf of nursing-home residents who are incompetent and those signed on behalf of nursing-home residents who are competent. 49 So.3d at 181.
SSC Montgomery argues that Noland Health Services is distinguishable inasmuch as Vicky Willis did not sign the contract containing the arbitration provision in Noland Health Services as Dorothy’s legal representative, while, SSC Montgomery asserts, Pleasant did sign the DRA as Means’s legal representative. We disagree, however, with SSC Montgomery’s assertion that Pleasant signed the DRA as Means’s legal representative. The signature block on the DRA indicates that Pleasant signed the DRA as “Legal Representative or Family Member.” (Emphasis added.) Moreover, although the paragraph above the signature line indicates that the signer of the document is asserting that he or she has “the authority to sign the agreement on [the resident’s] behalf,” merely claiming to have legal authority on someone else’s behalf or claiming to be someone else’s legal representative does not make it so. It is undisputed that Pleasant has never held a power of attorney for Means, and she also stated in an affidavit submitted to the trial court that she was granted “no legal authority by him or anyone else to enter into the [DRA] on his behalf.”
SSC Montgomery argues in the alternative that the doctrine of apparent authority should nevertheless bind Means, and by extension Bolding, to the DRA. In Carraway, we applied the doctrine of apparent authority to hold that Shirley Carr-away, a nursing-home resident, was bound by an arbitration agreement signed by her brother Richard Carraway:
“Just as Richard signed all the other documents relating to Shirley’s admission into the nursing home on Shirley’s behalf, Richard signed the arbitration agreement on Shirley’s behalf expressly as an ‘authorized representative.’ Apparent authority ‘is implied where the principal passively permits the agent to appear to a third person to have the authority to act on [her] behalf.’ Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc., 426 So.2d 859, 861 (Ala.Civ. App.1983). ‘It is not essential that the right of control be exercised so long as that right actually exists.’ Wood Chevrolet Co. v. Bank of the Southeast, 352 So.2d 1350, 1352 (Ala.1977). There is no evidence indicating that Shirley had any objection to Richard’s acting on her be *1199 half in admitting Shirley to the nursing home. On the contrary, the evidence suggests that Shirley approved of her brother’s acting on her behalf. A few weeks into Shirley’s residency at the nursing home, she executed a power of attorney, giving Richard further authority to act on her behalf.”
978 So.2d at 30-31. We likewise applied the doctrine of apparent authority in Johnson, stating that Dolores “passively permitted Barbara to appear to THM to have the authority to act on her behalf, and Barbara’s apparent authority is, therefore, implied.” 49 So.3d at 180. However, in both Carraway and Johnson the nursing-home resident was competent and effectively acquiesced to and/or ratified the decisions made by their respective representative, thus making the application of the apparent-authority doctrine appropriate.[4]
In contrast, the only evidence in the record in this case indicates that Means is incompetent and thus unable to empower an agent, whether passively or through affirmative acts. See Johnson, 49 So.3d at 180-81 (“[T]he nursing-home resident in Noland was mentally incompetent and could not authorize anyone to act on her behalf....”). Thus, at best Pleasant may have purported to be Means’s legal representative, but that is an insufficient basis upon which to apply the doctrine of apparent authority. Northington v. Dairyland Ins. Co., 445 So.2d 283, 286 (Ala.1984) (“[I]n order for a principal to be held liable under the doctrine of apparent authority and estoppel, the principal must have engaged in some conduct which led a third party to believe that the agent had authority to act for the principal.” (emphasis added)). See also Gray v. Great American Reserve Ins. Co., 495 So.2d 602, 607 (Ala.1986) (noting that one cannot “blindly trust” another’s statements regarding the extent of his or her agent power), and City Stores Co. v. Williams, 287 Ala. 385, 391, 252 So.2d 45, 51 (1971) (“The burden of proving agency rests upon the party asserting it.”).
In conclusion, we hold that Means was not bound by the DRA executed by Pleasant; therefore, Bolding was not bound. However, we emphasize that this conclusion is not reached because Means did not personally execute the DRA. Rather, it is because all the evidence in the record indicates that Means is incompetent. Thus, while Bolding, as the holder of a durable power of attorney granted by Means, may have been able to bind him to an arbitration agreement, Pleasant, as merely a family member or next friend, could not.
IV.
Bolding sued SSC Montgomery as Means’s attorney in fact and next friend, alleging medical malpractice in the care he received at Cedar Crest. SSC Montgomery moved to compel arbitration in the case pursuant to an arbitration agreement Pleasant signed when Means was admitted to Cedar Crest; however, the trial court denied that motion. We hereby affirm the judgment of the trial court, holding that Pleasant’s signature on the arbitration agreement was ineffective to bind Means, and by extension his legal representative Bolding, because the evidence indicates he was mentally incompetent at the time Pleasant executed the agreement.
AFFIRMED.
*1200 MOORE, C.J., and PARKER and WISE, JJ., concur.
MURDOCK, J., concurs in the result.

. Bolding's complaint also named as defendants four other corporate entities she alleged were related to SSC Montgomery, as well as two Cedar Crest employees. However, those corporate entities were later dismissed by agreement of the parties, and thp two Cedar Crest employees did not join in the motion to compel arbitration that is the subject of this appeal; therefore, in this opinion, we refer to only SSC Montgomery.

. Citing Queen v. Belcher, 888 So.2d 472, 477-78 (Ala.2003), SSC Montgomery argues that the statements in Bolding's affidavit regarding Means's competency cannot be considered; however, SSC Montgomery did not object to that affidavit or move to strike it, even though it filed a reply to the filing to which the affidavit was attached as an exhibit. Consideration of the affidavit is therefore proper. Ex parte Secretary of Veterans Affairs, 92 So.3d 771, 777 (Ala.2012).

. The United States Court of Appeals for the Eleventh Circuit concluded in Entrekin that part of the holding in Noland Health Services was inconsistent with Briarcliff, Carraway, and Johnson. 689 F.3d at 1255-60. However, it is unnecessary for us to consider that and other aspects of the Noland Health Services holding in this case.

. There is some indication in Carraway that Shirley may have been incompetent at the time she was admitted to the nursing home, although Richard’s argument was premised on the claim that she was in fact competent. 978 So.2d at 29-30. Regardless, it is undisputed that she apparently became competent at some point because she executed a power of attorney in favor of Richard after her admittance.